UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

---

|  |  |  |
|---|---|---|
| LESLIE BRYSON, | : | |
| Plaintiff, | : | |
| | : | No. 2:12-CV-00313-DB |
| vs. | : | |
| | : | |
| JEFFREY WESTERMAN & | | |
| PROVO CITY POLICE DEPARTMENT, *et al.*; | | Report of Kenneth R. Wallentine |
| Defendants. | | |
| | : | |

---

The following report of Kenneth R. Wallentine is submitted after review of the following

documents, pleadings, records, and reports:

Plaintiffs' Complaint, Initial Disclosures, Responses to Interrogatories and Production of

Documents

Defendants' Answers, Initial Disclosures, Responses to Interrogatories and Production of

Documents

Utah County Sheriffs Office Report

Criminal complaint against Jeffrey Westerman and associated docket

Video recordings

Deposition of Craig Geslison

Deposition of Jeffrey Westerman

Training records and personnel file of Jeffrey Westerman

Summaries and documentation of prior allegations of employee misconduct

Utah POST Curriculum 2005-06

Kenneth R. Wallentine states as follows:

1.      In the instant matter, I have relied upon the documents, pleadings, records, reports, and statements previously described. I have formed a number of opinions based upon the aforementioned, as well as my experience, education, and familiarity with professional publications. I have relied on a variety of professional publications, including, but not limited to, my own publications and court decisions cited therein. Those opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows. My opinions are based on information currently available to me, within a reasonable degree of professional certainty, and are subject to amendment and supplementation upon receipt of additional information. I have provided a synopsis of events based on the documents, pleadings, records, reports, and statements provided to me to help explain the circumstances and environment of the incident.

**Incident synopsis:**

On July 22, 2010, at approximately 6:30 p.m., defendant Jeffrey Westerman, at that time employed as a Provo City Police Officer, was dispatched to investigate a minor traffic collision at 70 East 300 South, Provo, Utah. Plaintiff Leslie Bryson was one of the drivers involved in the collision. Because the damage was minimal and deemed not-reportable under state reporting

law, Westerman obtained driver information and soon released Andrew Svetleck, the other driver involved in the collision.

Westerman then moved Bryson's vehicle to a nearby empty parking lot partially enclosed by a fence. Westerman administered field sobriety tests to Bryson. Westerman told Bryson that he suspected that she was impaired. He became abusive to Bryson, yelling at her and using vulgar language. Bryson was frightened of Westerman. Westerman told Bryson to expose her breasts to him. She did so. Westerman reached into Bryson's car, fondled her breasts roughly and pinched her nipples. He told Bryson to expose her breasts to him a second time and he again fondled her breasts.

Westerman released Bryson approximately one-half to three-quarters of an hour after first contacting her. Bryson drove to a friend's home. She later went to an area hospital. There she reported the incident to detectives from the Utah County Sheriff's Office. Both the Sheriff's Office and the Provo City Police Department investigated the allegations against Westerman.

Westerman was charged with forcible sexual abuse for his assault on Bryson and for obstructing justice for making false statements during the course of the investigation. He was convicted of both charges and sentenced to a jail term and fine. His police certification was revoked by the Utah Council on Peace Officer Standards and Training (POST).

a. **The Provo City Police pre-employment screening process was reasonable and was consistent with generally accepted policies, practices and training.**

   1. The Provo Police Department administered the routine hiring process to Westerman, including a background investigation. Westerman represented to the Provo Police Department that he possessed the requisite education and

*Bryson v. Westerman, et al.*
*Report of Kenneth R. Wallentine*          3

qualifications for employment as a Provo Police Officer. His employment history was unremarkable and showed continuous employment from the time that he was seventeen years old until he was hired by the Provo Police Department, excepting a two year period in which Westerman worked as a volunteer on behalf of his church in Brazil. Westerman maintained employment while a college student at Utah State University. He became certifiable as a peace officer through the Salt Lake Community College satellite POST program in 2006.

2. Westerman participated in the rigorous selection process for the Utah Police Corps program. However, funding for the program was cut prior to his acceptance and the program was terminated. Westerman scored high on the entrance examinations. The Police Corps program was well-regarded nationally and in Utah and an agency considering an applicant who had done well in the selection process would consider that success as a positive indicator in the hiring decision. Westerman also reported Spanish and Portuguese language abilities, which are generally very desirable, particularly in the Provo metropolitan area, due to the significant population of Spanish-speaking immigrants in the community.

3. Hindsight allows negative interpretation of some comments provided by Westerman's prior employers. However, several more specific comments from the most recent employers, particularly those most related to law enforcement, would lead a reasonable police administrator toward a positive hiring decision. For example, while James Nye of the Utah State University Police Department

commented on "judgment issues 10% of the time," Nye's more direct and specific evaluation was that Westerman was a good worker, dependable and one with morals, values and integrity. Nye predicted that Westerman would be a good police officer. Steve Stout, Westerman's supervisor at the time of his application with Provo Police Department, offered very laudatory comments about Westerman's performance with the Utah Transit Authority Police Department. Stout also recommended Westerman for hiring as a police officer and predicted success.

4.  Over the course of my career I have reviewed hundreds of applications for law enforcement employment and admission to basic training programs. I cannot recall a single application that did not contain some unfavorable comment or historical note in the applicant's background. Police administrators must choose potential police officers from an applicant pool of imperfect humans. Practicality and state law set certain absolute disqualifications for police officer employment. Westerman's history contained no such disqualifications. Though he had some negative employment history, the background investigation revealed generally favorable history and recommendations–even from those who honestly expressed their assessment of Westerman's prior employment history. For example, James Nye noted that Westerman might not have consistently shown the sensitivity of interpersonal communication that Nye would want to have extended to his own wife and daughter. In essence, Nye contextually expressed a concern about communication style, a concern that was at least tempered or rebutted by the

comments of other, more recent law enforcement employers. Still, Nye recommended Westerman. Even coupled with an incident of conflict with another employee and with the black mark of abusing computer time to pursue an eBay auction, a reasonable police administrator would not have seen a history that predicted failure as a police officer or that a sexual assault would likely happen several years after the hiring decision.

5.     Many, if not most, Utah police departments and sheriffs' offices do not refer police officer candidates for psychological testing. The Provo Police Department does so and sends its applicants to Associated Behavior Consultants. This firm is generally regarded throughout the region as the superior group of professional mental health workers and is frequently used for pre-employment and post-employment fitness for duty evaluations. Westerman's evaluation was conducted by Dr. Eric Nielsen, the principal professional at Associated Behavior Consultants. Dr. Nielsen has many decades of experience working with law enforcement and military organizations. He is very highly regarded by his peers and enjoys a solid reputation among chiefs and sheriffs as a professional skilled at assisting in the law enforcement screening process. Dr. Nielsen noted that Westerman reported not becoming sexually active until married and denied regretting any sexual activity. A battery of psycho-social assessment instruments produced favorable results. Dr. Nielsen described Westerman as low risk in areas of behavior inappropriate for a police officer. Dr. Nielsen recommended Westerman for hiring as a Provo city Police Officer. A reasonable police

administrator would heavily rely on the results and interpretation of such testing and personal evaluation by Dr. Neilsen.

6. Westerman was not given a pre-employment polygraph examination. Most Utah agencies do not use polygraphy for pre-employment purposes, perhaps in recognition of the limits of polygraph examinations and the disfavor shown to polygraph examination results by Utah courts. Others may find alternative investigative tools to be more reliable, efficient and productive. I am familiar with the scope of the typical pre-employment polygraph examination for a police officer applicant, directly supervising a veteran polygraph examiner who has administered hundreds of such examinations and having personally reviewed the results of such examinations. It is admittedly impossible to conclude what value a pre-employment polygraph examination has for police officer applicants. However, the standard pre-employment questioning does not include questions that are reasonably likely to form even the most speculative basis to predict a sexual assault that might occur several years after hiring an officer, particularly where there was not then and is not now any extrinsic evidence of even a remotely similar event in the applicant's pre-employment history.

7. The Provo Police Department subjected Westerman to a reasonable and adequate employment screening process. The Provo Police Department conducted a background investigation that was reasonably calculated to uncover any history, tendencies or characteristics relevant to the decision to hire Westerman. It is my opinion that there is no connection between the hiring process, including the

background investigation, and the injuries alleged by plaintiff. The Provo Police Department exercised reasonable diligence in screening Westerman for hiring. The Provo Police Department had no reason to question the disclosures, reports, references and assessments submitted to it by various sources, including Westerman, in connection with its hiring decision. It is my opinion that a reasonable police chief would have decided to hire Westerman as a police officer based on the information known to the Provo Police Department at the time of Westerman's application.

b. **The Provo City Police training addressing unlawful harassment and protection of civil rights was reasonable and was consistent with generally accepted policies, practices and training.**

1. The Provo Police Department took several affirmative steps to inform its members, including Westerman, about their obligations of ethical conduct. As a Provo city employee, Westerman was directed to follow the provisions of the Employee Handbook, which proscribes any form of sexual harassment, including unwanted physical contact. Westerman acknowledged his understanding that he was bound by the handbook in a written declaration. Westerman participated in policy review training that included discussion of the Provo Police Department standards of conduct. Westerman participated in sexual harassment training in October 2007. He received ethics training in March 2009. Westerman also attended the POST Special Functions Officer and Law Enforcement Officer courses in 2006. Those courses include components addressing ethics and the

Law Enforcement Code of Ethics, as well as ethical decision-making scenario training. The training must have had some effect; Westerman admitted that his actions violated Provo Police Department policies.

2.  Provo Police Department promulgated a general directive (the term by which Provo City Police binding policies are known) that established standards of conduct for its officers. Those standards required, among other things:

> Officers shall conduct themselves toward the public in a civil and professional manner that connotes a service orientation and that will foster public respect and cooperation.
>
> . . . .
>
> Officers shall treat violators with respect and courtesy, guard against employing an officious or overbearing attitude or language that may belittle, ridicule, or intimidate the individual, or act in a manner that unnecessarily delays the performance of their duty.
>
> . . . .
>
> While recognizing the need to demonstrate authority and control over criminal suspects and prisoners, officers shall adhere to this agency's use of force policy and shall observe the civil rights and protect the well-being of those in their charge.
>
> . . . .
>
> Police officers will behave in a manner that does not bring discredit to their agencies or themselves.

Westerman was responsible to know and adhere to these policy provisions. Moreover, he was specifically trained by the Chief of Police on the standards of conduct at the time of his hiring. Chief Geslison testified that he stressed ethical violations of a sexual nature in the training sessions that he presented. Westerman attended a refresher training in the standards of conduct in March 2009 and in February 2010, just a few months prior to the incident leading to this litigation. Though none of these provisions explicitly detail a prohibition on sexual assault of a citizen, any police officer would easily discern that respecting civil rights, protecting citizens and treating them with courtesy and respect and conducting themselves in a civil and professional manner plainly proscribes the gross deviation from expected conduct as manifest in a sexual assault.

3.   Westerman became eligible for certification by the Utah Council on Peace Officer Standards and Training as a law enforcement officer upon his completion of the basic training program in 2006. Eligibility for certification signifies that he had attended all mandatory courses, successfully completed proficiency testing and otherwise met Utah POST certification requirements. Westerman's training included completion of 12 hours of core ethics and professionalism courses required by Utah POST. The training also included 15 hours of instruction in laws of arrest, search and seizure and police liability. In addition to the core curriculum, the Utah POST academies follow a scenario-based learning reinforcement plan that requires scenario participation and proficiency testing. The Provo City Police Department could reasonably rely on Utah POST to present

training and testing on ethics and professionalism and legal instruction and testing on citizens' civil rights, including the right to be free from unlawful seizures and assaults.

4.     Police administrators face some challenges that are perennial, universal and directly related to scarce public funding. One such issue is the need for continual training. Some agencies may provide training in standards of conduct and ethical behavior with greater frequency or longer duration than the Provo City Police Department. I am aware of agencies that provide less. The number of hours recorded or the number of minutes that officers are actually seated in the classroom often do not reflect the "training" that can be most effective, including the clear articulation of expectations of conduct communicated by a person of significant authority. Such was evident in Chief Geslison's personal delivery of training in the standards of conduct.

5.     Certain forms of conduct are universally understood as repugnant to the police mission and far exceeding legitimate police authority. For example, no reasonable police officer in the United States could believe that it is lawful and acceptable to deploy an electronic control device on a young child who is creating a public disturbance by crying because he became separated from his parents at the fairgrounds. There are some forms of police misconduct that are simply beyond any arguable level of acceptance. Westerman's assault on plaintiff fits this category. No police officer could argue any justification for Westerman's conduct toward plaintiff. Indeed, when the allegations against Westerman became

generally known and he was convicted of sexual assault, I heard several Utah police officers and administrators express incredulity at Westerman's conduct. Not every conceivable contingency can be addressed in police training. Some are so improbable because their very nature is grossly inconsistent with the police mission and with generally accepted policing philosophy that they do not require specific mention. I am not aware of any agency that presents a learning objective or standard of conduct that states that "an officer shall not sexually assault a citizen in the course of the officer's work day." On the other hand, there are Utah laws that specifically prohibit sexual assault and sexual conduct with persons in police custody or merely under police supervision. The Provo City Police Department reasonably relied on universally held police values and expectations of conduct to believe that no officer, including Westerman, would sexually assault a person in the course of investigating a traffic collision.

6. The Provo City Police training and policies addressing ethical behavior, sexual harassment and investigation of allegations of officer misconduct are consistent with policies, practices and training that are used throughout Utah law enforcement agencies and generally recognized as consistent with constitutional standards as presented to Utah law enforcement agencies. Plaintiff's expert cites advisory standards promulgated by the private commercial enterprise of the Commission on Accreditation of Law Enforcement Agencies ("CALEA"). I concur that an agency must have sound training and policies and that external accreditation and self-analysis can be helpful in insuring the validity of an

agency's policies. However, CALEA has no presence in Utah municipal law enforcement agencies. Though there is some national debate over the vitality and applicability of CALEA's published standards and its fee and cost and profit structures, acceptance of CALEA in the Intermountain West since CALEA's inception has been particularly notably lacking. No Utah cities subscribe to CALEA accreditation. Among the many hundreds of municipal law enforcement agencies in Utah's neighboring states, only a tiny handful are accredited by CALEA. In Idaho and Wyoming, there are no accredited cities; there are nine in Colorado, three in Nevada, seven in Arizona, and only two in New Mexico. The Utah Chiefs of Police Association spent several years studying and analyzing the for-profit CALEA. That organization rejected CALEA and opted for independent and regionally-relevant accreditation criteria by non-profit entities, with accreditation inspections conducted by trained assessors.

7. Westerman acknowledged the content and unambiguous core of the ethics training provided to him. Westerman testified that his actions against plaintiff were "contrary to all training that I had received prior." He knew that his behavior was "ethically wrong." He noted sexual harassment training provided by Provo City Police, as well as his two prior law enforcement employers, recalling specifically his annual training by Provo City Police. No matter how many minutes Westerman heard training on the parameters of unacceptable conduct, he readily acknowledged that his training taught him that he should not have sexually assaulted plaintiff. Westerman also cited his foundational personal and religious

beliefs as sources of understanding that he committed egregious misconduct. Those sources form the basic moral character that a police agency tries to evaluate prior to hiring. As he applied to the Provo City Police Department, Westerman presented himself as a person with moral values, acknowledging minor moral lapses in his youth. The Provo City Police Department had no evidence that Westerman presented any risk of committing a sexual assault as a police officer.

c.   **The supervision of Jeffrey Westerman by Provo City Police supervisory staff was reasonable and was consistent with generally accepted policies, practices and training.**

1.   The Provo Police Department command and supervision structure follows a model generally employed by agencies of similar size and similar mission in Utah. In addition to a standard command and supervision structure, the Provo Police Department employed three deep supervision for its patrol components. This allowed closer and more effective supervision of patrol officers. The Provo City Police department also used an internal quality assurance program. Command and supervisory staff regularly participated in leadership and supervision courses and seminars offered by the Utah Chiefs of Police Association. This is indicative of an agency committed to effective supervision.

2.   The Provo Police Department conducted periodic supervisory reviews of Westerman's performance at regular intervals. These performance reviews were generally favorable. Some deficiencies were noted. For example, Westerman was repeatedly counseled about issuing traffic citations rather than warning motorists

when he stopped them. This issue seems to pervade the department. The CityGate report notes the dissatisfaction with the emphasis by some police and city officials on issuing citations. Though the reason for the pressure to issue citations requiring court prosecution is not evident, what is clear is that Westerman was not alone in questions over the number of citations issued compared to warnings given. Westerman was also counseled about documenting field contacts by the use of field interview forms (an issue possibly related to the documented pressure to produce statistics).

3.  None of the periodic reviews contain any hint that reviewing officials observed conduct that could have lead a reasonable police supervisor to believe that Westerman posed a risk of sexually assaulting a citizen.

4.  Westerman successfully completed a one year probationary period with the Provo Police Department on October 15, 2007. During his tenure with the Provo Police Department, Westerman received a number of commendations and awards. These included numerous commendation letters, "Catch of the Month" award and a letter from the local Special Agent in Charge of the Federal Bureau of Investigation commending his performance. Westerman also received counseling, primarily for deficiencies in generating court citations and for driving errors.

5.  Westerman's performance records do not show particularly noteworthy positive performance, nor do the records reflect particularly poor performance. The records do document that Westerman's performance was regularly observed and evaluated and that his supervisors documented their efforts to supervise him and

provide direction to him. The records also show, through the history of addressing Westerman's driving conduct, that his supervisors carefully monitored identified concerns and applied principles of progressive counseling and discipline to attempt to remediate the deficient performance.

6. Westerman was called to assist Officer Sean Ellefsen on a call of persons drinking alcohol and smoking marijuana in a vehicle. Griffin Geslison, a juvenile and son of Chief Geslison, was the driver. Officer Ellefsen administered field sobriety tests to Griffin Geslison and determined that there was not probable cause to arrest him for driving under the influence of alcohol and/or controlled substances. No drugs or alcohol were found in Griffin Geslison's possession. He was charged with a fireworks violation. Griffin Geslison was driving his parent's car. As is common practice, and virtually the universal practice in Utah, Griffin Geslison's parents were notified of the stop and asked to respond to take responsibility for their car because Griffin Geslison showed some signs of having smoked marijuana.

7. Chief Geslison responded to the scene of the traffic stop and took control of his son and his vehicle. Allowing a parent to do so is consistent with Utah law, Utah juvenile court procedure and good police practice. Once Chief Geslison was at his home, he thoroughly searched his car. He found his son's wallet and searched it as the car owner and parent, a measure that the patrol officers would not likely have been lawfully able to do based on the limited probable cause known to them. Chief Geslison found a small amount of marijuana in his son's wallet. Chief

Geslison called for an officer to meet with him and take custody of the marijuana. Chief Geslison told the officer where he had found the marijuana, provided evidence against his son and implicated his son in a crime. The officer then spoke with Griffin Geslison, who cooperated. One can only posit that the cooperation was due, at least in part, to parental guidance.

8. Plaintiff's expert cites the aforementioned sequence of events as intimating that Chief Geslison or the Provo City Police Department allowed unethical behavior or showed lapsed supervision. To the contrary, the record shows that Officer Ellefsen did not extend any special treatment or courtesy to the Geslison family that one would not expect a Utah police officer to show to any other family in like circumstances. Moreover, Chief Geslison was under no obligation or duty–personal or professional–to search his car and find evidence that would implicate his son in a crime. Once Chief Geslison found the marijuana, he did what the most ethical police officer would do and turned the evidence and his son into the police. Certainly Chief Geslison could have acted the role of a protective and indulging parent. Instead, he plainly chose the ethical part and took the higher road as a parent and as a police chief.

9. The initial crime report from plaintiff was made to the Utah County Sheriffs Office, which, in turn, notified the Provo City Police Department. The Provo City Police Department took prompt and decisive action once the report was received. Chief Geslison directed Sergeant Mark Crosby to investigate. Sergeant Crosby immediately began his investigation and notified Westerman that he was

suspended from duty. Westerman was stopped from working another minute in a law enforcement capacity for the Provo City Police Department. Such immediate action was reasonable and was consistent with generally accepted policies, practices and training.

10.     I reviewed numerous investigation files pertaining to allegations of employee misconduct unrelated to this incident. I also reviewed the Provo City Police General Directive governing internal affairs investigations. The policy requires various levels of investigation and investigative review, depending on the severity of the alleged misconduct. The Provo City Police internal affairs investigation policy is consistent with generally accepted policies, practices and training. The investigative reports that I reviewed indicated thorough investigation and adequate supervisory review of the investigations.

2.     In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career. A summary of my qualifications, publications, litigation history and fee schedule are recited herein.

3.     **My qualifications as an expert in this subject matter include the following:** I am a law enforcement officer in the State of Utah. My primary employment is for the Utah Attorney General, where I serve as the Chief of Law Enforcement. I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of

Utah. I also supervised the police service dog training and certification program for the State of Utah. I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety. I became certified as a law enforcement officer in the State of Utah in 1982. My duties include direct supervision and command of various investigative units and agents throughout the State of Utah, supervising approximately thirty-five law enforcement officers, forensic specialists, and technicians, as well as approximately one dozen part-time peace officer employees. I command the State of Utah Child Abduction Response Team. I command the State of Utah Officer-Involved Fatality Investigation Team. I am a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations. In 2010, Governor Herbert selected me for the Governor's Leadership in Public Service award for my work in public safety leadership.

4.      I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability. I regularly teach in the Basic Training programs of the Utah State Police Academy. I regularly teach in the following specialized courses: Advanced Officer Course, Firearms Instructor Course, Utah Drug Academy, Utah Crime Scene Investigators Academy, Utah Sheriffs' Association Command College, First Line Supervisor Course, POST K9 Unit Administrator Course, POST Patrol Dog Handler Course, POST Narcotics Detector Dog Course, and others. I am a former police service

*Bryson v. Westerman, et al.*
*Report of Kenneth R. Wallentine*          19

dog handler and worked with the Uintah County Sheriff's K9 Unit from 1995 to 2001. I
continue to provide instruction and evaluation services for the POST Police Service Dog
program. I am a certified POST Firearms Instructor, often serving as the lead instructor for
POST Firearms courses. I am certified by the Force Science Research Center as a Force Science
Analyst ®. I am a certified TASER® Instructor. I am a certified Excited Delirium and Sudden
Death Investigation Instructor. I was certified by the Los Angeles Police Department in Officer-
Involved Shooting Investigation. In 2011, I was certified by the Institute for the Prevention of
Sudden In-Custody Death as an instructor in restraint systems.

5.      I am a licensed attorney, having practiced law since 1990. I am admitted to practice
before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits,
and the State and Federal courts in the State of Utah. I am a Master of the Bench of the
American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court. I
serve as an Administrative Law Judge for the State of Utah and for various counties and cities in
Utah, providing hearing officer and appellate hearing services for hearings involving allegations
of police officer misconduct for a variety of state agencies and municipalities. I was formerly on
the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management
Strategies for Public Safety.

6.      In addition to my primary employment, I occasionally consult and provide expert witness
opinions on police procedures and use of force issues. I occasionally perform in-custody death
investigations and officer-involved shooting death investigations for agencies which may lack the
requisite expertise. I am a consultant to the Utah Risk Management Mutual Association, the
state's largest insurer of public safety agencies, on matters of officer conduct and discipline,

hiring and screening practices, use of force, and police pursuit policies. I am the co-founder of, and legal advisor to, a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies. These policies serve as a model for all Utah public safety agencies. I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies. I have served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

7.     I participate and serve in a number of community and professional capacities. Professional activities pertinent to law enforcement include serving as a Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member of the International Association of Law Enforcement Educators and Trainers Association, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators and Trainers Association, member of the K9 Section of the Utah Peace Officers Association, member of the United States Police Canine Association, past member of the board of directors of the NAACP, Salt Lake City branch, and board member and immediate past-Chairman of the Utah Law Enforcement Legislative Committee. I formerly

served as a gubernatorial appointee to the Council on Peace Officer Standards and Training. I currently frequently serve as a member *pro tempore* of the Council on Peace Officer Standards and Training. I am a former member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University. I have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police and the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

8.      Since 1994, I have been a consultant with the K9 Academy for Law Enforcement and the International Police Canine Conference. My principal responsibilities are to provide use of force training, civil liability instruction, and search and seizure instruction. I have provided police service dog training and certification standards consultation for two police service dog organizations, including a western regional group and one of the major national groups. I serve as a consultant for the California Narcotic and Explosive Canine Association and have been a featured lecturer at their annual training conference over the past decade.

9.      I am a Senior Legal Editor for Lexipol, Inc., the nation's largest provider of policy formulation and revision for public safety agencies and policy-based training, responsible for reviewing and editing the work of legal staff in creation of policy manuals for law enforcement agencies. In that capacity, I have assisted in the drafting and review of use of force and police

service dog policies in current use by more than 1,400 police agencies and correctional facilities in the United States.

10. **My publications (limited to ten years) include the following:** I have previously published a number of other professional articles, many of which have been subjected to peer review. My most recent book, *The K9 Officer's Legal Handbook*, was published by Lexis/Nexis Matthew Bender in December 2008. It includes an extensive discussion of use of force by police officers. Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, was published in 2007 by the American Bar Association Publishing Division. It is a treatise on public safety and criminal procedure, and includes multiple chapters on search and seizure and use of force by police officers. My other published works, limited to the past ten years, include: *Post Incident Video Review*, Police Chief, V. 68, No. 12 (2011); *Cell Site Location Evidence: A New Frontier in Cyber-Investigation*, 2011 (2) AELE Mo. L. J. 501, *Prospects, Pitfalls and Pains of Social Media and Public Safety*, The Municipal Lawyer, September 2010; *Police Department May Read Text Messages Sent on Agency-issued Pagers: City of Ontario, California v. Quon*, Police Chief, V. 57, No. 8 (2010); *Collection of DNA Upon Arrest: Expanding Investigative Frontiers*, Police Chief, V. 57, No. 1 (2010); *Targeting TASER: The New TASER Aim Points,* Law Officer, January 2010; *The Risky Continuum: Abandoning the Use of Force Continuum to Enhance Risk Management*, The Municipal Lawyer, July 2009; *Explosive Detector Dog Legal Issues*, K9 Cop, February 2009; *Does Police Service Dog Deployment Equal Deadly Force?*, K9 Cop, April 2009; *Human Scent Line-up Evidence*, Police K9 Magazine, August 2009; *Acknowledging Gender in Fitness Standards for Police: An Invitation to Liability?*, The Municipal Lawyer, January 2008; *K9 Court Testimony*, Police K9,

December 2006; *United States Supreme Court Review for Corrections Managers*, Corrections

Managers Report, October 2006; *Conduct Unbecoming an Officer*, The Municipal Lawyer,

January 2005; *Limits on Off-Duty Police Employment*, The Municipal Lawyer, Spring 2004;

*Conjugal Prison Visits*, Corrections Manager, March 2003; *Life in the Law* (BYU Press 2002),

co-author; *Investigating In-Custody Death*, Corrections Manager Report, October 2002; *Police

Canine Risk Management*, The Municipal Lawyer, July 2002; and a variety of columns

addressing law enforcement issues and published by PoliceOne.com. I am the author of a

reference book currently in use in the Utah Law Enforcement Academy, as well as other police

academies throughout the United States, titled *Criminal Procedure: The Street Cop's Guide*

(Aspen Press 2005). This book discusses detention and arrest of persons, use of force, and search

and seizure of persons and property, among other subjects.

11.     **My fee schedule is established as follows:** I charge $250.00 per hour for examination of

reports and documents, site visits, interviews, administrative tribunal, deposition or court

testimony, with a minimum of $1,000.00 for deposition or court testimony. I bill for actual travel

expenses and a travel fee of $1,000.00 per day/part-day for travel to western states and $1,500.00

per day/part-day outside western states.

12.     **My prior experience as an expert witness (limited to the past four years) includes

the following cases:** I have been qualified as an expert in the subject matter of police

procedures, including use of TASER® devices, excessive force, shootings and wrongful death

claims, search and seizure, police service dog use, both in drug detection and dog bites, and I

have never had a court decline to find that I am a qualified expert witness. I have testified and/or

provided depositions and trial testimony in the following cases which may be generally related to

the subject of the instant litigation in the past four years: *Thompson v. City of Lebanon*, No. 1:10-CV-0035, United States District Court for the Middle District of Tennessee, 2013. Deposition testimony given on behalf of the defendants. *Chief v. West Valley City Police, et al.*, No. 2:11-CV-643, United States District Court for the District of Utah, 2013. Deposition testimony given on behalf of the defendants. *Stoedter v. Salt Lake County, et al.*, No. 2:12-CV-255-BJ, United States District Court for the District of Utah, 2013. Deposition testimony given on behalf of the defendants. *Texiera v. United States of America, et al.*, No. 2:11-CV-02022, United States District Court for the District of Nevada, 2013. Deposition testimony given on behalf of the defendants. *Boggs v. City of Waterloo*, No. LACV116584-CW, Blackhawk County District Court, 2013. Deposition testimony given on behalf of defendants. *Schmidtke v. Marion County Sheriff et al.*, No. 5:10-CV-293-OC- 10prl, United States District Court for the Middle District of Florida, 2012. Deposition testimony given on behalf of the defendants. *Alusa v. Salt Lake County Sheriff, et al.*, No. 2:11-CV-00184-CW, United States District Court for the District of Utah, 2012. Deposition testimony given on behalf of the defendants. *Woodward v. City of Gallatin, et al.*, No. 3:10-CV-01060, United States District Court for the Middle District of Tennessee, 2012. Deposition testimony given on behalf of the defendants. *Minor v. Johnson, et al.*, No. 1016-CV08762, Circuit Court of Jackson County, Missouri, 2012. Deposition testimony given on behalf of defendants. *Garcia v. Sacramento City, et al.*, No. 2:10-CV-00826-JAM-KJN, United States District Court of California, Eastern Division, 2012. Deposition testimony given on behalf of the defendants. *Cavanaugh v. Woods Cross City, et al.*, No. 1:08CV00032, United States District Court of Utah, Central Division, 2011. Trial testimony given on behalf of the defendants. *Ibarra v. City of Watsonville*, Watsonville Municipal Civil Service Commission,

2011. Trial testimony given on behalf of Respondent. *Jones v. City of Waterloo*, No. 6:10-CV-02014-LRR United States District Court of Iowa, 2011. Trial testimony given on behalf of the defendants. *Cardall v. Thompson, et al.* Case No. 2:10-CV-00305-CW, United States District Court of Utah, Central Division, 2011. Deposition testimony given on behalf of defendants. *Krause & Martin v. Manalapan Township*, Case No. 3:09-CV-0287, United States District Court of New Jersey, 2010. Deposition testimony given on behalf of defendant. *Mitchell v. Dow*, Case No. 2:08-CV-00726-DB, United States District Court of Utah, 2010. Trial testimony given on behalf of defendants. *Al-Asadi v. City of Phoenix, et al.*, No. 2:09-CV-00047, United States District Court of Arizona, 2010. Deposition testimony given on behalf of the defendants. *United States v. Beltran-Palafox*, No.09-40022-01/02 JAR, United States District Court of Kansas, 2010. Trial testimony given on behalf of the plaintiff. *United States v. Trestyn & Herren*, No. 09-CR-00216-B, United States District Court of Wyoming, 2010. Trial testimony given on behalf of the plaintiff. *United States v. Ludwig*, No. 08-CR-00224-D, United States District Court of Wyoming, 2009. Trial testimony given on behalf of the plaintiff. *Evans v. Taylorsville City*, Case No. 2:06-CV-00631 TS, United States District Court of Utah, Central Division, 2009. Deposition testimony given on behalf of the defendants. *Swofford v. Eslinger*, Case No. 6:08-CV-00066-PCF-DAB, United States District Court of Florida, Orlando Division, 2009. Deposition testimony given on behalf of the defendants.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the general accuracy of the documents, statements, and reports, excepting those

expressed as opinions and those conflicting one with another and/or conflicting with physical evidence, that were provided to me. The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by plaintiff's experts, further investigation and/or further witness interviews. I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or diagrams, video and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.

## CONCLUSION

The Provo City Police pre-employment screening process was reasonable and was consistent with generally accepted policies, practices and training. The Provo City Police training addressing unlawful harassment and protection of civil rights was reasonable and was consistent with generally accepted policies, practices and training. The supervision of Jeffrey Westerman by Provo City Police supervisory staff was reasonable and was consistent with generally accepted policies, practices and training.

Kenneth R. Wallentine
September 13, 2013

Kenneth R. Wallentine
5272 South College Drive, Suite 200
Murray, Utah 84123